1  PHILIP A. GASTEIER (State Bar No. 130043)
   NATELLA ROYZMAN (State Bar No. 245852)
2  ROBINSON, DIAMANT & WOLKOWITZ
   A Professional Corporation
3  1888 Century Park East, Suite 1500
   Los Angeles, California 90067
4  Telephone:  (310) 277-7400
   Telecopier: (310) 277-7584
5
   Attorneys for Alberta P. Stahl,
6  Chapter 7 Trustee

7

8              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
9                 **LOS ANGELES DIVISION**

10

11  In re                          Bk. No. 2:05-12488-TD

12  JACK GARRETT,                   Chapter 7

13                                  **NOTICE OF MOTION AND MOTION TO**
            Debtor.                 **DISALLOW CLAIM; MEMORANDUM OF**
14                                  **POINTS AND AUTHORITIES;**
                                    **DECLARATIONS IN SUPPORT THEREOF**
15                                  **[Claim No. 178]**

16

17                                  Date:  November 18, 2009
                                    Time:  11:00 a.m.
18                                  Place: Courtroom 1345
                                           Roybal Federal Building
19                                         255 East Temple Street
                                           Los Angeles, CA 90012
20

21

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

NR/00203294.WPD/MTN/18076.000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .   ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . .   3

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . .   4

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . .   6

      A.    Procedural Requirements For Objection to Claims . . .   6

      B.    Substantive Basis For Objection to Claim . . . . . .   6

            1.    The Claim is Not A Claim Against the Debtor  . .   6

            2.    The Trustee Reserves the Right to Bring An
                  Adversary Proceeding to Subordinate the Claim
                  Pursuant to 11 U.S.C. § 510(b) . . . . . . . .   7

                  a.    The Instrument(s) Issued to the Claimant by
                        Four Star are Securities as Contemplated by
                        11 U.S.C.A. § 510(b)  . . . . . . . . . .   8

                  b.    The Claim Is Based on Damages Arising from
                        the Purchase or Sale of a Security of an
                        Affiliate of the Debtor . . . . . . . .   12

            3.    The Trustee Reserves The Right to File
                  Further Objection to the Amount Of The
                  Claim Upon Receipt of Additional
                  Information . . . . . . . . . . . . . . . .   14

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . .   15

DECLARATION OF NATELLA ROYZMAN  . . . . . . . . . . . . . .   16

# TABLE OF AUTHORITIES

CASES                                                                PAGE(S)

In re Am. Wagering, Inc.,
    493 F.3d 1067 (9th Cir. 2007) . . . . . . . . . . . . 8, 9

In re Bankest Capital Corp.,
    361 B.R. 263 (Bankr. S.D. Fla. 2006) . . . . . . . . . 8

In re Betacom of Phoenix, Inc.,
    240 F.3d 823 (9th Cir. 2001) . . . . . . . . . 7, 9, 12

In re Courtside Village, LLC,
    2003 WL 22764541 (Bankr. N.D. Cal. 2003) . . . . . . 11

In re Enron Corp.,
    341 B.R. 141 (Bankr. S.D.N.Y. 2006) . . . . . . . . . 9

In re Geneva Steel Co.,
    281 F.3d 1173 (10th Cir. 2002) . . . . . . . . . . . 12

In re Granite Partners, L.P.,
    208 B.R. 332 (Bankr. S.D.N.Y. 1997) . . . . . . . . 13

In re Holiday Mart, Inc.,
    715 F.2d 430 (9th Cir. 1983) . . . . . . . . . . . . 8

In re JTS Corp.,
    305 B.R. 529 (Bankr. N.D. Cal. 2003) . . . . . . . . 9

In re Legacy Estate Group,
    05-14659, 2007 WL 3245240 (Bankr. N.D. Cal. Nov. 2, 2007) 8

In re Mid-Am. Waste Sys., Inc.,
    228 B.R. 816 (Bankr. D. Del. 1999) . . . . . . . . . 8

In re Public Service Co. of New Hampshire,
    129 B.R. 3 (Bankr. D. N.H. 1991) . . . . . . . . . 13

In re Telegroup, Inc.,
    281 F.3d 133 (3d Cir. 2002) . . . . . . . . . . 10, 12

                                                              PAGE(S)

In re Touch\ America Holdings, Inc.,
        381 B.R. 95 (Bankr. D. Del. 2008) . . . . . . . . . 8, 13

Maze v. Sycamore Homes, Inc.,
        230 Cal. App. 2d 746, 41 Cal. Rptr. 338
        (Cal. Ct. App. 1964) . . . . . . . . . . . . . . . 14

PT-1 Communications, Inc.,
        304 B.R. 601 (Bankr. E.D. N.Y. 2004) . . . . . . . 12


STATUTES

11 U.S.C.A. § 101(2) . . . . . . . . . . . . . . . . . . . 5

11 U.S.C. § 510(b) . . . . . . . 1, 4, 7, 8, 9, 10, 12, 13, 14

11 U.S.C.A. § 101(49)(A)(i) . . . . . . . . . . . . . . . . 8

RULES

Fed. R. Bankr. P. 3007 . . . . . . . . . . . . . . 2, 6, 15

TO THE HONORABLE THOMAS B. DONOVAN, UNITED STATES BANKRUPTCY JUDGE; CLAIMANT ROBERT H. LIPP; THE OFFICE OF THE UNITED STATES TRUSTEE; AND INTERESTED PARTIES:

**PLEASE TAKE NOTICE** that Alberta P. Stahl, the chapter 7 Trustee ("Trustee") for Jack Garrett, debtor herein (the "Debtor"), will and does hereby move this Court for an order disallowing Claim No. 178 (the "Claim") filed by Robert H. Lipp ("Claimant"), on the grounds set forth in the attached Memorandum of Points and Authorities, which are incorporated herein by reference. A true and correct copy of the Claim is attached to the Declaration of Natella Royzman as <u>Exhibit 178</u>. The Claim is filed as a general unsecured claim in the amount of $600,000.

Without limitation, the Trustee objects to the Claim because the Claim is not against the Debtor. In the event that the Claim is not disallowed pursuant to this Motion, the Trustee reserves the right to file further objection to the amount of the Claim upon receipt of additional information, or to bring an adversary to subordinate it pursuant to 11 U.S.C. § 510(b). In support of this Motion, the Trustee further relies on the Declaration of Natella Royzman, the record in this case, and such further evidence and arguments as may be presented to the Court prior to or at the time of hearing.

**PLEASE TAKE FURTHER NOTICE** a hearing on this Motion will be held before the Honorable Thomas B. Donovan, United States Bankruptcy Judge, in Courtroom "1345" United States Bankruptcy Court, 255 East Temple Street, Los Angeles, CA 90012 on November 18, 2009 at 11:00 a.m.

///

1       **PLEASE TAKE FURTHER NOTICE** that pursuant to Bankruptcy

2 Rule 3007-1(b), any response to the objection must be filed with

3 the Clerk of the Court no later than fourteen (14) days prior to

4 the date of the hearing and served upon the attorneys for the

5 Trustee at the address set forth in the upper left-hand corner of

6 page one of this Notice and Motion.

7       **PLEASE TAKE FURTHER NOTICE** that pursuant to Bankruptcy

8 Rule 3007-1(b), failure to timely file and serve written

9 opposition may be deemed by the Court to be consent to the

10 granting of the relief requested in the objection.

11

12 DATED: October 14, 2009     ROBINSON, DIAMANT & WOLKOWITZ

13                               A Professional Corporation

14                               By: _____

15                                    PHILIP A. GASTEIER

                                   NATELLA ROYZMAN

16                           Attorneys for the Chapter 7 Trustee

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

This memorandum sets forth the grounds and supporting legal authorities for the Trustee's objection to the "Claim" filed by the "Claimant" identified in the attached Motion. Defined terms in the Motion shall have the same meaning herein. This section summarizes general objections to claims similar to the Claim. Specific grounds for objection to the Claim are discussed in Section III below.

Some, but not all, Four Star Financial Services, LLC ("Four Star") investors filed claims against the bankruptcy estate of Jack Garrett ("Garrett" or the "Debtor"), even though in every case, their investment was with Four Star and not Garrett. Accordingly, the Trustee is requesting that the claims be disallowed on the grounds that they are not properly claims against Garrett and should not be paid from this estate.

Furthermore, many of the claims were filed for amounts in excess of the amounts invested or the losses incurred. The Trustee has obtained information from the Chapter 7 Trustee of Four Star to support the accurate amounts of the claims for investment in Four Star. Thus, even if the claims were properly allowed as against Garrett, they should only be allowed in the reduced amount.

Some Four Star investors filed claims as secured claims, even though they received no grant of a security interest in Garrett's assets. Even had the Four Star investor been granted a security interest in the assets of Four Star, that

1 would not provide them with a security interest in the assets of
2 Garrett.

3      For these reasons, as well as any additional grounds
4 discussed below, the Claim should be disallowed as a claim in
5 this estate.

6      In addition, although not a ground for objection in
7 this Motion, the Trustee reserves the right to bring an adversary
8 action to subordinate any allowed claims filed by the Four Star
9 investors pursuant to 11 U.S.C. § 510(b).  Subordination of
10 claims like the Four Star investor claims, which are based on
11 damages in connection with the purchase of a "security," is
12 mandatory.  As discussed further below, the term "security" is
13 broadly defined in the Bankruptcy Code to encompass the
14 instruments around which the Claim is based.  Thus, if the claims
15 are allowed at all, the Trustee intends to bring an adversary on
16 the grounds that they must be subordinated.

17
18                              **II.**

19                      **STATEMENT OF FACTS**

20      On October 24, 2003, an involuntary bankruptcy petition
21 was filed against Four Star under Chapter 11 of the Bankruptcy
22 Code.  On March 18, 2004, the case was converted to one under
23 Chapter 7 of the Bankruptcy Code and Richard A. Marshack was
24 appointed as the Chapter 7 Trustee (the "Four Star Trustee").
25 Based on the Four Star Trustee's analysis, Four Star, which
26 basically operated a Ponzi scheme, originally factored
27 receivables for companies operating 900 number services, and
28 subsequently diversified into the sale and resale of telephone

time, auto loans, internet pornography, loans, and other investments.

On November 1, 2004, Garrett filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida. Subsequently, pursuant to the Four Star Trustee's Motion to Transfer Venue based on Garret's status as an affiliate of Four Star, Garrett's bankruptcy case was transferred to the United States Bankruptcy Court for the Central District of California by Order entered on December 21, 2004. The Debtor's bankruptcy case is presently pending as In re Jack Garrett, Case No. LA 05-12488-TD. The Bankruptcy Court ordered conversion of the case to a Chapter 7 case by order entered on April 7, 2005. Alberta P. Stahl (the "Trustee") was appointed as chapter 7 Trustee on or about April 14, 2005.

Based on pleadings on file with this Court, Garrett is and has been found to be an "affiliate" of Four Star as that term is defined in 11 U.S.C. § 101(2). Four Star's Amended Operating Agreement indicates that Garrett owned and controlled fifty percent of the voting power in Four Star. According to the Four Star Trustee, at the time of its bankruptcy filing, Four Star's managing members were Ronald Anson and Garrett. The Trustee is informed and believes that Garret is also an affiliate of Four Star's related entity 900 Capital Services, Inc. by virtue of his interest in that entity.

///
///
///

# III.

## ARGUMENT

### A.    Procedural Requirements For Objection to Claims

Rule 3007 of the Federal Rules of Bankruptcy Procedure governs the procedure for objection to claims and provides:

> An objection to the allowance of a claim shall be in writing and filed.    A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession . . . at least thirty days prior to the hearing.

Fed. R. Bankr. P. 3007.  Pursuant to Rule 3007, a copy of the Motion has been served upon the Claimant at the address set forth in the Claim, as well as their last known address, and upon the Debtor at least thirty (30) days prior to the hearing date set by the Court for consideration of the Motion.  Thus, the Trustee has complied with Rule 3007.

### B.    Substantive Basis For Objection to Claim

#### 1.    The Claim is Not A Claim Against the Debtor

The Trustee respectfully submits that the Claim should also be denied on the grounds that it is not properly a claim against the Debtor.  The Claim is based on investments with Four Star Financial Services or a related entity, evidenced by an agreement with and/or statements from Four Star or such entity, not the Debtor.  Nothing in the Claim or attachments to the Claim demonstrates any basis for asserting that it is against the Debtor personally.  Although in some cases the Debtor signed the agreements, it is clear that he did so only on behalf of Four Star.  There is no evidence in the Claim or attachments to the

Claim indicating that the Debtor personally guaranteed any of Four Star's promises or otherwise assumed any personal liability. Thus, there is no basis for asserting that the Debtor is liable on the Claim, and it should be disallowed as a claim in this estate.

**2.    The Trustee Reserves the Right to Bring An Adversary Proceeding to Subordinate the Claim Pursuant to 11 U.S.C. § 510(b)**

In the event that the Court determines that the Claim is valid and allowable in this estate, the Trustee reserves the right to bring an adversary action to subordinate the Claim pursuant to 11 U.S.C. § 510(b) based upon the grounds set forth below.

The Claim is based on damages arising from the Claimant's participation in Four Star, an affiliate of the Debtor. As such, the Claim is subject to 11 U.S.C. § 510(b), which provides:

> For the purpose of distribution under this title, <u>a claim</u> arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, <u>for damages arising from the purchase or sale of such a security</u>, or for reimbursement or contribution allowed under section 502 on account of such a claim, <u>shall be subordinated</u> to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added). Subordination of claims under this section is mandatory. <u>In re Betacom of Phoenix, Inc.</u>, 240 F.3d 823, 827 (9th Cir. 2001).

One of the purposes of Section 510(b) is to "prevent disappointed shareholders, sometimes the victims of corporate

fraud, from recouping their investment in parity with unsecured
creditors." In re Am. Wagering, Inc., 493 F.3d 1067, 1071-2
(9th Cir. 2007). It is based on "[t]he principles behind
corporate and bankruptcy laws, [which] do not favor shifting the
risk of loss from shareholders to creditors, even if the
shareholders are blameless." Id. However, "the rationale for §
510(b) is not limited to preventing shareholder claimants from
improving their position vis-a-vis general creditors; Congress
also made the decision to subordinate based on risk allocation."
In re Mid-Am. Waste Sys., Inc., 228 B.R. 816, 826 (Bankr.
D. Del. 1999).

      a.    **The Instrument(s) Issued to the Claimant by**
                 **Four Star are Securities as Contemplated by**
                 **11 U.S.C.A. § 510(b)**

      The term "security" as used in § 510(b) is expansively
defined to cover much more than ownership of stock in a company.
Simply put, "Section 510(b) is not limited to shareholder
claims." In re Touch America Holdings, Inc., 381 B.R. 95, 103
(Bankr. D. Del. 2008). The term "security" is defined in the
Bankruptcy Code to include notes, bonds and debentures. 11
U.S.C.A. § 101(49)(A)(i) ; see also In re Holiday Mart, Inc., 715
F.2d 430, 434 (9th Cir. 1983); In re Bankest Capital Corp., 361
B.R. 263, 267 (Bankr. S.D. Fla. 2006) ("The unambiguous language
of the statute specifically *includes* debt securities such as
promissory notes."); In re Legacy Estate Group, 05-14659, 2007 WL
3245240 (Bankr. N.D. Cal. Nov. 2, 2007) (a promissory note the
claimant was fraudulently induced to accept in exchange for
release of the claimant's claim against the debtor was a

"security" for purposes of section 510(b)). Even options to purchase stock are deemed "securities" for purposes of the subordination provision' of the bankruptcy code. See In re Enron Corp., 341 B.R. 141, 150 (Bankr. S.D.N.Y. 2006).

Cases demonstrate that whether a note or any other form of investment instrument is a security for purposes of 510(b) is primarily dependent on whether the claimant's expectation for return payment was more in the nature of that of an investor than that of a creditor. For example, in In re Betacom of Phoenix, Inc., 240 F.3d 823 (9th Cir. 2001), the Ninth Circuit found that "the dissimilar risk and return expectations of investors and creditors" should be taken into account in determining the standard for mandatory subordination. Id. at 829. The Court further explained that an investor enters into an agreement with greater financial expectations than creditors because while a "creditor can only recoup her investment[,] the investor expects to participate in firm profits." Id. at 830. Following Betacom's rationale, the Ninth Circuit later held in In re American Wagering, Inc., 493 F.3d 1067 (9th Cir. 2007), that an agent who did not receive his promised compensation pursuant to an employment agreement had a fixed, pre-petition debt due and owing to him as a creditor, "not the risk/return position of an equity investor in the now-bankruptcy corporation." Id. at 1073; see also In re JTS Corp., 305 B.R. 529, 545 (Bankr. N.D. Cal. 2003) (where "the claimant's expectations were those of an investor rather than a creditor, then subordination is more likely to serve the goal of the statute.").

///

The Trustee has identified five representative types of instruments or agreements Four Star's investors received: (1) Cash Flow Note (2) Investment Agreement, (3) Investor Agreement, (4) Subscription Agreement, and (5) Participation Agreement. See Exhibit A to the Royzman Declaration for samples of each type. Where, as here, a claim is based on an instrument for which the potential return is dependent on the profits of the enterprise or a specific endeavor of the enterprise, it is clear that the investor parted with his or her money in the expectation of *participating* in the success of that enterprise. It is this participatory aspect which separates out the investor's purchase of a security (which is subject to subordination under 510(b)) from the claim of a trade creditor or a lender on fixed terms. See In re Telegroup, Inc., 281 F.3d 133, 142 (3d Cir. 2002) ("because claimants retained the right to participate in corporate profits if Telegroup succeeded, we believe that § 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors.").

Although there are some variations within the representative types of instruments Four Star issued investors, in every case they evidence an agreement to participate in Four Star's earnings. For example, Provision 3 of the "Cash Flow Note" provides that "interest and any payable principal shall be payable . . . only if and to the extent of available cash flow of 4 Star is sufficient to pay the interest due to Lender and all other holders of Cash Flow Notes." Driving this point home, provision 5 of the Cash Flow Note further provides that Four Star

shall not be obligated to repay principal and/or interest "to the extent that said payment would render 4 Star unable to pay its current obligations or would otherwise violate covenants with third party non-cash flow based lenders." The "Investment Agreement," each version of which explicitly refers to an investment Four Star would make with the principal invested, provides that payments to the "Investor" will be made "out of first money received from said investment," or that the "Investor shall receive all earnings from the Acceptable Investment" up to a maximum yield. Similarly, the "Investor Agreement" states that the "Investor" shall be paid "out of income generated by 900" Capital Services. Perhaps even more explicit is the "Subscription Agreement," which offers membership units pursuant to a Private Placement Memorandum, which entitle investors to "certain distributions payable from Available Cash from Operations." Finally, the Participation Agreement provides that the "Participant" is "to receive first monies allocable to Participant's percentage."

Thus, the instrument or instruments from which the Claim arises reveal that the transaction was not the typical credit transaction. The agreement between the Claimant and Four Star was not a promise to pay interest on a loan so much as a promise to pay based on the success of a particular enterprise. A return based on the success of an investment is a hallmark of a security. See In re Courtside Village, LLC, 2003 WL 22764541 (Bankr. N.D. Cal. 2003) (finding that despite being called "soft notes," notes which provided that payment of the principal or interest would be made "only if and to the extent that Funds are

available," were actually "equity interest profit
participations."). By bargaining for the opportunity to
participate in Four Star's profits, the Claimant was more akin to
an investor than a creditor. Accordingly the Claim involves a
"security" as contemplated by Section 510(b).

        **b.**   **The Claim is Based on Damages Arising From**
             **the Purchase or Sale of a Security of an**
             **Affiliate of the Debtor**

        Although Section 510(b) refers to "a claim arising from
rescission of a purchase or sale of a security," it is not
limited to claims based on securities fraud. In re Betacom of
Phoenix, Inc., 240 F.3d 823, 828 (9th Cir. 2001). The section
has been interpreted broadly by courts to require only that there
is "some nexus or causal relationship between the claim and the
sale [or purchase] of the security." In re Telegroup, Inc., 281
F.3d 133, 138 (3d Cir.2002). Courts have interpreted § 510(b)'s
reach to apply to a broad range of claims, requiring
subordination of not only claims for damages arising from fraud
in the issuance of securities, but also damages based on
fraudulent retention, and even damage claims for breach of
contract and other tortious conduct. See PT-1 Communications,
Inc., 304 B.R. 601, 607-610 (Bankr. E.D. N.Y. 2004) (finding that
a claim based on tortious interference with injured shareholder's
ownership interest should be subordinated even though there was
no issuance of stock to injured party); In re Betacom of Phoenix,
Inc., 240 F.3d at 823 (applying § 510(b) to a breach of contract
claim seeking damages for failure to convey the debtor's stock as
required under merger agreement); In re Geneva Steel Co., 281

1 F.3d 1173 (10th Cir. 2002) (applying § 510(b)to a claim for

2 damages based on post investment misrepresentations that

3 allegedly caused the investor to hold on to the debtor's stock

4 rather than sell it); In re Public Service Co. of New Hampshire,

5 129 B.R. 3, 4 (Bankr. D. N.H. 1991) (noting that the language of

6 510(b) is broad enough to include breach of contract and related

7 actions in addition to claims based on securities fraud).

8        Given this broad interpretation, it is irrelevant

9 whether the Claim is based on damages arising from some form of

10 tort or breach of contract, or even breach of fiduciary duties.

11 See In re Touch America Holdings, Inc., 381 B.R. 95, 106 (Bankr.

12 D. Del. 2008) (finding that although the complaint on which a

13 claim was based sought damages for breach of fiduciary duties,

14 section 510(b) applied to subordinate the claim because the gist

15 of the litigation was to recover damages based upon the lost

16 value of stock).  Similarly, it is irrelevant whether the claim

17 is based on damages from the purchase of the security or the

18 retention of the security.  See In re Granite Partners, L.P., 208

19 B.R. 332 , 339 (Bankr. S.D.N.Y. 1997) (reading § 510(b) to

20 require only that the purchase or sale of a security "be part of

21 a causal link[,] although the injury may flow from a subsequent

22 event").  The clear and pivotal fact is that the Claim is for

23 damages surrounding the sale or purchase of a "security."  Thus,

24 regardless of how the damages claimed are characterized, there is

25 still a clear underlying nexus between the Claim and the purchase

26 or sale of a "security."  Therefore, if the Claim is allowed at

27 all, it should be subordinated to all claims of senior or equal

28 ///

1 rank, including general unsecured claims, pursuant to 11 U.S.C. §
2 510(b).

3       Based upon the above authority, if the Claim is not
4 disallowed pursuant to this Motion, the Trustee intends to bring
5 an adversary action against the Claimant to seek mandatory
6 subordination of the Claim. Accordingly, if the Claim is
7 allowed, the Claimant is encouraged to contact counsel for the
8 Trustee to work out a stipulation for expeditious handling of the
9 issue of subordination in an adversary proceeding.

10     **3.**    **The Trustee Reserves the Right to File**
11         **Further Objection to the Amount of the Claim**
12         **Upon Receipt of Additional Information**

13       The Claim is filed in the amount of $600,000. The
14 Trustee believes it is possible that the Claimant included
15 accrued interest and/or principal repaid by Four Star in this
16 amount. The Trustee asserts that interest and/or repaid would
17 not be allowable as a claim in this estate even if the balance of
18 the claim is allowed. As discussed above, the Trustee submits
19 that the investments with Four Star were purchases of securities
20 and that related claims are subject to subordination. However,
21 should any investment be found to be a loan based on a fixed
22 return rate, it is clear that the interest rate is usurious and
23 that any claim for interest must be disallowed. See Maze v.
24 Sycamore Homes, Inc., 230 Cal.App.2d 746 (1964). Morever, such
25 additional amounts may not properly be included in damages.
26 Thus, the Claim should be allowed, if at all, only in the amount
27 of principal invested by the Claimant with Four Star less amounts
28 repaid. As of the date of this Motion, the Trustee has not been

1 able to obtain information necessary to identify such amounts
2 from Four Star.  Accordingly, should any claim be allowed in
3 favor of the Claimant, the Trustee reserves the right to file a
4 further objection to the amount of the Claim upon receipt of
5 additional information.

7                              **IV.**

8                          **CONCLUSION**

9           For all of the reasons set forth herein, the Trustee
10 submits that this Motion complies with Fed. R. Bankr. P. 3007
11 and Local Bankruptcy Rule 3007-1.  Accordingly, the Trustee
12 respectfully requests that the Court enter an order providing
13 that the Claim is disallowed in its entirety.

15 DATED:  October 14, 2009        ROBINSON, DIAMANT & WOLKOWITZ
                                    A Professional Corporation

17                              By: _____
                                        PHILIP A. GASTEIER
18                                      NATELLA ROYZMAN
                                    Attorneys for Chapter 7 Trustee

## DECLARATION OF NATELLA ROYZMAN

I, NATELLA ROYZMAN, declare as follows:

1.    I am an attorney at law, duly licensed to practice before this Court.  I am an associate of the Law Firm of Robinson, Diamant & Wolkowitz, A Professional Corporation, counsel for Alberta P. Stahl, the duly-appointed, qualified, and acting Chapter 7 trustee in the above-captioned bankruptcy case. All of the following facts are within my personal knowledge and are facts to which I could and would competently testify if called as a witness in this matter.

2.    This Declaration is made in support of the foregoing Motion.  Defined terms in the Motion shall have the same meaning herein.

3.    Attached hereto as <u>Exhibit 178</u> is a true and correct copy of the Claim of Robert H. Lipp, entered on the Claims Register as Claim No. 178.

4.    From my review of the Claims, I have identified five representative types of instruments or agreements Four Star issued investors: (1) Cash Flow Note; (2) Investment Agreement; (3) Investor Agreement; (4) Subscription Agreement; and (5) Participation Agreement.  A true and correct copy of a sample of each type of agreement is Attached hereto as <u>Exhibit A</u>.

Executed under penalty of perjury under the law of the United States of America this 14th day of October, 2009 at Los Angeles, California.

_____
NATELLA ROYZMAN

# EXHIBIT 178

MRR/00178451.WPD/MISC/00005.000

Form B10 (Official Form 10) (04/07)

| United States Bankruptcy Court | Central District of California | **PROOF OF CLAIM** |

| Name of Debtor<br>GARRETT, JACK | Case Number<br>LA 05-12488-TD | |

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property): ROBERT H. LIPP

Name and address where notices should be sent:

ROBERT H. LIPP
270 18TH STREET
SANTA MONICA, CA 90402

Telephone number: 310-395-2679

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

FILED
SEP 17 2007

This space is for Court use only.

Last four digits of account or other number by which creditor identifies debtor:

Check here
if this claim ☐ replaces ☑ amends a previously filed claim, dated 5/31/05

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☑ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (Fill out below)
  Last four digits of your Social Security number: _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)                    (date)

**2. Date debt was incurred:** 1/24/00, 3/3/00

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ 600,000 (unsecured) $ _____ (secured) $ _____ (priority) $ 600,000 (Total)

☐ If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
- ☐ Real Estate  ☐ Motor Vehicle
- ☐ Other

Value of Collateral: $ _____

Amount of arrearage and other charges at time case filed included in secured claim, if any $ _____

**6. Unsecured Nonpriority Claim.** $ 600,000
☑ Check this box if (a) there is no collateral or lien securing your claim, or (b) your claim exceeds the value of the property securing it or (c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority.
Amount entitled to priority $ _____
Specify the priority of the claim:
- ☐ Wages, salaries or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
- ☐ Up to $2,425* of deposits toward purchase, lease or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
- ☐ Domestic support obligations under - 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

This space is for Court use only.

| Date<br>8/20/07 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): *R.t.H. Lipp* | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

CCD-B10

00017

EXHIBIT 178.

FORM B10 (Official Form 10)(04/04)

| UNITED STATES BANKRUPTCY COURT | PROOF OF CLAIM |
|---|---|
| CENTRAL DISTRICT OF CALIFORNIA | |

| Name of Debtor<br>GARRETT, JACK | Case Number<br>LA 05-12488-TD<br><br>Credit id: 996 |
|---|---|

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>ROBERT H LIPP<br><br>Name and Address where notices should be sent:<br><br>ROBERT H LIPP<br>270 18TH ST<br>SANTA MONICA, CA 90402-2404<br><br>Telephone Number: 310 - 395 - 3360 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |
|---|---|

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here if ☐ replaces
this claim ☐ amends     a previously filed claim, dated:

FILED

1. **Basis for Claim**
   - ☐ Goods sold
   - ☐ Services performed
   - ☑ Money loaned
   - ☐ Personal injury/wrongful death
   - ☐ Taxes
   - ☐ Other

   - ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
   - ☐ Wages, salaries, and compensation (fill out below)
     Last four digits of SS #:
     Unpaid compensation for services performed
     from _____ to _____
         (date)           (date)

2. **Date debt was incurred:** 1/24/00   3/5/00

3. **If court judgment, date obtained:**

4. **Total Amount of Claim at Time Case Filed:** $ _____ 660,000 _____ 660,000
   (unsecured)     (secured)     (priority)     (Total)

   ☐ If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
   Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. **Secured Claim.**
   ☑ Check this box if your claim is secured by collateral (including a right of setoff).

   Brief Description of Collateral:
   ☐ Real Estate   ☐ Motor Vehicle
   ☑ Other  Four Stars Assets per the Agreement

   Value of Collateral:  $ _____

   Amount of unrearage and other charges at time case filed included in secured claim, if any: $ _____

6. **Unsecured Nonpriority Claim** $ _____
   ☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

7. **Unsecured Priority Claim.**
   ☐ Check this box if you have an unsecured priority claim

   Amount entitled to priority $ _____
   Specify the priority of the claim:
   ☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(3).
   ☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4).
   ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6).
   ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
   ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
   ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
   *Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

8. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

9. **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

10. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

996 76

| Date<br>5/24/05 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

000983

00018

## Investment Agreement

Whereas, Four Star has determined to invest in what is commonly referred to in the telecommunications industry as arbitrage;

Whereas, Four Star has considerable experience in such investments;

Whereas, Robb Lipp has agreed to invest $600,000 in Four Star to allow Four Star to make such investments;

It is, therefore, agreed as follows:

1. On a monthly basis, Four Star shall make payments to Investor out of first money received from said investment until Investor has received an amount that equates to an annual yield of 30%.

2. Investor has agreed that its investment shall be tied up for a minimum of 40 weeks. Thereafter, the return of the investment may be demanded back with the giving of at least six weeks notice.

3. It is understood that the investment may conclude earlier than anticipated by Four Star. In that event, Four Star may and will return Investor's money as soon as it then becomes available from the investment.

4. During times that the dollars may for short periods not be utilized for the designated investments, Four Star reserves the right to invest said money as it deems fit so as to prudently maximize yield.

5. Four Star has represented that while the principal invested is safe, the exact amount of yields generated might be speculative. Accordingly, while Four Star does guarantee the return of principal from the investment activity, it makes no guarantees or warranties concerning yield.

00019

## Investment Agreement

Agreed to by:

**Four Star Financial Services, LLC**        **Robb Lipp**

**2**

# EXHIBIT A

# CASH FLOW NOTE

· **THIS CASH FLOW NOTE** is entered into this 22nd day of August, 2000, by and between Four Star Financial Services, LLC (4 Star) and ▓▓▓▓▓▓▓▓▓▓ (hereinafter referred to as "Lender") and is one of a series of Cash Flow Notes issued by 4 Star on identical terms (except as to amounts and dates) to other persons.

   1.    Amount of Loan.

   4 Star promises to pay to Lender the sum of fifty thousand dollars ($50,000) (the "Loan"), receipt of which is acknowledged by 4 Star.

   2.    Due Date.

   The Loan shall be due and payable in full, including any accrued but unpaid interest, on August 22, 2010 (the "Due Date") or, if earlier, on demand pursuant to Section 5 hereof.

   3.    Interest on Loan.

   The Loan shall bear interest at a rate of eighteen percent (18%) per annum, compounded monthly and computed on the basis of a three hundred sixty–five (365) day year. Such interest and any principal otherwise payable shall be payable on the fifth (5th) day of each calendar month following the date hereof, until the Loan is repaid in full, but only if and to the extent that available cash flow of 4 Star is sufficient to pay the interest due to Lender and all other holders of Cash Flow Notes (including interest accrued for prior periods but unpaid). For purposes of this Cash Flow Note, "available cash flow" means the difference between (a) the sum of (i) income or losses from operations of 4 Star; (ii) any allowance for depreciation and/or amortization of the cost of any other asset of 4 Star; and (iii) any funds that have become available to 4 Star by reason of the reduction of reserves, to the extent not reflected in income; and (b) the sum of (i) all amounts paid by 900 on account of the amortization of borrowings secured by mortgages, deeds of trust, or other encumbrances on the assets of 4 Star or any other borrowings by 4 Star (including loans made by other unsecured lenders), other than out of borrowings or capital contributions to 4 Star; and (ii) increases in reserves not reflected in losses from operations.

   4.    Investment Covenants.

   Until this Cash Flow Note is repaid in full, 4 Star covenants that it shall not acquire any assets or make loans or investments which are not described in one or more of the following subparagraphs:

   a.    Accounts receivable and/or positions which, when mature, shall become accounts receivable from companies in the telephone industry. Acceptable obligors include AT&T, MCI, and any other billing company maintaining a billing agreement with one or more local exchange carriers in the United States. Other acceptable obligors include all local exchange carriers in the United States and Canada, Telcom Australia, as well as all long distance carriers approved by 4 Star, the principal phone companies of the United Kingdom and Hong Kong, and ultimate users of telephone lines.

   b.    Accounts receivable or other debt obligations which meet any of the following criteria:

   i.    Payment of at least the principal is guaranteed by an insurance company with a Best's rating of B or better;

**EXHIBIT A**

ii.        Payment of at least the principal is guaranteed by a company with a net worth of at least thirty (30) times the amount of the subject obligation;

iii.       Payment (or purchase of the obligation) is guaranteed by a governmental agency;

iv.       Payment is secured by collateral with a value at least one-and-one-half (1.5) times the face amount of the subject obligation;

v.       Payment is secured by cash or cash equivalents;

vi.       The obligation is of, or payment is guaranteed by, a company with a net worth of $75 million or more.

c.       Investments in telephone transport and accounts receivable or other obligations relating to telephone transport time, *i.e.*, the right to use telephone long distance carriers for "900" numbers or other purposes. These rights would include but not be limited to the right to invest in telephone carriers;

d.       Accounts receivable, debt obligations, contracts, or other choses in action representing a stream of payments due from subscribers, members, or similar payers which, in 4 Star's reasonable discretion, are similar in nature to those described in paragraph 4.c hereof.

e.       Other accounts receivable, of which no single account exceeds three percent (3%) of all assets of 4 Star and which in the aggregate are twenty-five percent (25%) or less of all assets of 4 Star.

f.       Any other assets to the extent of ten percent (10%) of the assets of 4 Star.

5.       <u>Payment on Demand</u>.

At any time prior to the Due Date, upon ninety (90) days' notice to 4 Star, Lender may demand payment in full of the principal amount of the Loan and any interest accrued but unpaid thereon. However, 4 Star shall not be obligated to repay in that time frame to the extent that said payment would render 4 Star unable to pay its current obligations or would otherwise violate covenants with third party non-cash flow based lenders.

6.       <u>Prepayment</u>.

At any time, upon ninety (90) days' notice to Lender, 4 Star may prepay the Loan in whole or in part.

7.       <u>Miscellaneous</u>.

a.       Except as otherwise expressly provided herein, all the terms and provisions of this Cash Flow Note shall be binding upon, shall inure to the benefit of, and shall be enforceable by and against the parties hereto and their respective heirs, beneficiaries, legal representatives, successors and assigns.

b.       This Cash Flow Note contains the entire understanding of the parties with respect to its subject matter. There are no restrictions, agreements, promises, warranties, covenants, or undertakings other than those expressly set forth herein or therein. This Cash Flow Note supersedes all prior agreements and understandings between the parties with respect to its subject matter.

c. The section and paragraph headings contained in this Cash Flow Note are for reference purposes only and shall not affect in any way the meaning or interpretations of this Cash Flow Note.

d. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity, or entities may require.

e. This Cash Flow Note may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimile signatures shall be acceptable to all parties as if they were original signatures.

f. This Cash Flow Note may not be modified except by a written instrument signed by the party to be charged or by its agent duly authorized.

g. If any of the provisions of this Cash Flow Note are held to be unenforceable by a court of law, then the remaining provisions of this Cash Flow Note shall continue to be in full force and effect.

h. All notices and requests hereunder shall be in writing and shall be delivered in person or by certified or registered mail, postage prepaid, or by overnight delivery service such as Federal Express, or by electronic transmission, addressed to:

If to 4 Star:       Four Star Financial Services, LLC
           11755 Wilshire Blvd. Suite 1350
           Los Angeles, CA 90025
           Facsimile: (310) 312-3305

If to Lender:



Such notices and requests shall be deemed delivered on the day on which personally delivered or electronically transmitted or, if delivered by mail, on the third (3rd) business day after deposit in the United States mail, as evidenced by a post office receipt furnished to the sender. Any party may change its address for receipt of notices and requests hereunder by notice duly given to the other parties in accordance with the provisions of this paragraph 7.1.

i. In the event of any legal action, equitable suit, arbitration or other proceeding arising out of or related to this Agreement or the relationship of the parties created hereby (including, without limitation, any action, suit or other proceeding brought by a party for the enforcement or collection of any judgment, order or award issued by any court or tribunal of competent jurisdiction or arbitrator in connection herewith), the successful or prevailing party shall be entitled to recover his, her, or its reasonable attorneys' fees and costs incurred in such proceeding, whether incurred prior to or after commencement of such proceeding, on appeal or otherwise, in addition to any other relief to which such party may be entitled.

j.    This Cash Flow Note shall be governed by and construed in accordance with the laws of the State of New York, regardless of the residence or place of business of Lender.

k.    During reasonable business hours until this Cash Flow Note is repaid in full, and upon providing 4 Star with at least three (3) business days' notice, Lender or Lender's representative may inspect the books and records of 4 Star. Lender shall do so in a fashion that does not cause the business activity of 4 Star to be interrupted.

l.    Lender understands and acknowledges that nothing in this Cash Flow Note shall impair or impede the ability or right of 4 Star to borrow from other lenders and grant security interests in any of the assets of 4 Star to secure any such loans, and Lender shall cooperate with 4 Star and such lenders and execute any and all documents reasonably requested by 4 Star or such lenders  consistent with this paragraph l. Lender acknowledges and agrees that it is and shall be in all respects subordinate to the positions of all third party non-cash flow based lenders

**IN WITNESS HEREOF,** Four Star Financial Services, LLC. and ▮▮▮▮▮▮▮▮ have caused this Cash Flow Note to be executed.

Four Star Financial Services, LLC

Lender:

By: _Leslie Farrell_

Title: _President_

By: ▮▮▮▮▮▮▮▮

Title: ▮▮▮▮

## Guaranty

The obligations set forth herein are hereby unconditionally guaranteed by 900 Capital Services, Inc.

## Investment Agreement

Whereas, Four Star has determined to invest in what is commonly referred to in the telecommunications industry as arbitrage;

Whereas, Four Star has considerable experience in such investments;

Whereas, ██████████████████ have agreed to invest $100,000 in Four Star to allow Four Star to make such investments;

It is, therefore, agreed as follows:

1. On a monthly basis, Four Star shall make payments to Investor out of first money received from said investment until Investor has received an amount that equates to an annual yield of 30%.

2. Investor has agreed that its investment shall be tied up for a minimum of 40 weeks. Thereafter, the return of the investment may be demanded back with the giving of at least six weeks notice.

3. It is understood that the investment may conclude earlier than anticipated by Four Star. In that event, Four Star may and will return Investor's money as soon as it then becomes available from the investment.

4. During times that the dollars may for short periods not be utilized for the designated investments, Four Star reserves the right to invest said money as it deems fit so as to prudently maximize yield.

5. Four Star has represented that while the principal invested is safe, the exact amount of yields generated might be speculative. Accordingly, while Four Star does guarantee the return of principal from the investment activity, it makes no guarantees or warranties concerning yield.

1

00025

Investment Agreement

Agreed to by:

Four Star Financial Services, LLC ████████████████████

_____        _____ 4/5/00

00026

# INVESTOR AGREEMENT

This Agreement is entered into this 20th of January, 1995 by and between 900 Capital Services, Inc. (900) and ████████████ (hereinafter referred to as Investor).

1) Subject to the terms and conditions set forth in this Agreement, Investor agrees to loan 900 the sum of Fifty Thousand dollars ($50,000).

2) Unless otherwise demanded pursuant to the terms of this Agreement, the loan shall be repaid along with accrued interest at the end of the ----- month after the making of the subject loan (Loan).

3) Out of income generated by 900, 900 shall pay Investor an amount equating to a fifteen percent (15%) yield on Investor's money on an annual basis. This yield shall be computed based on a three hundred sixty-five (365) day year and be payable out of available cash flow on or before the fifth (5th) day of each calendar month.

4) If and to the extent that income and resulting cash flow is inadequate during any month to pay the applicable portion of the fifteen percent (15%) yield, then one hundred percent (100%) of the existing cash flow for the subsequent month shall be allocated toward paying the Investor and other Investors the similarly situated all proceeds until such time that Investor has received the applicable portion of its fifteen percent (15%) annualized yield. The apportionment of the payment between the Investor and the Investors similarly situated shall be prorated based on the amount of their loans.

5) 900 shall be permitted to invest along the following guidelines:

a) To purchase accounts receivable and/or positions which when mature shall become accounts receivable. A designated source shall emanate from the telephone industry. Acceptable obligors shall be AT&T, MCI and any other billing company maintaining billing agreements with one or more of the local exchange carriers in the country. Further acceptable obligor shall include all local exchange carriers in the United States, Canada, Telcom Australia, the principal phone companies of the United Kingdom and Hong Kong as well as direct receivables from the ultimate consumers of the telephone lines.

b) Accounts receivable or other debt obligations which meet any of the following criteria:

    i) The payment of at least the principal as guaranteed by an insurance company with a rating in Bests of B or better;

    ii) The payment of principals guaranteed or backed by any company with a net worth of at least fifty times the subject obligation;

    iii) The take out or repayment is guaranteed by a government agency;

    iv) The obligation is secured so that the debt to equity ratio is less than or equal to fifty percent (50%);

    v) Any debt instruments secured or backed by cash collateral or cash equivalent;

    vi) Telephone transport time i.e. the right to use telephone long distance for 900 or other purposes;

    vii) Any investments backed by companies with $75 million or more in net worth.

c) Other accounts receivable, for which any single receivable does not exceed point five percent (.5%) of available outstanding investments and all accounts receivable of a similar nature that are less than fifteen percent (15%) of outstanding investments.

d) Ten percent (10%) of the available funds may be invested at 900's discretion and secured debt instruments which may not specifically meet the above criteria.

6) At any time during the term of this Loan, Investor may request the repayment of the principal amount of the loan and any accrued earnings upon providing 900 thirty (30) days written notice. Upon receipt of said notice, 900 will cause to be liquidated said portion of its portfolio necessary to repay the debt in the requested time.

7) At 900's option, upon providing Investor <u>Ninety</u> days written notice of its intention to do so, it may repay all or any portion of the Loan.

8) At Investor's option, it may receive the early repayment of the subject obligation upon providing 900 at least <u>Ninety</u> days prior written notice and demand for repayment.

9) Required payments as set forth herein shall be paid out of the available assets and operating revenues of 900.

00028

10) The parties shall provide notices by certified or registered mail, return receipt requested, with copies of notices provided by facsimile.

If to 900, then the notice shall be sent to:

900 Capital Services, Inc.
11755 Wilshire Blvd., Ste. 2150
Los Angeles, Calif. 90025
Attention: Jack Garrett
fax #: (310) 478-5535

If to Investor, then the notice shall be sent to:



11) This Agreement shall be interpreted pursuant to the laws of the State of California.

12) 900's books and records are maintained at 11755 Wilshire Blvd., Ste. 2150, Los Angeles, Calif. 90025.

13) During reasonable business hours and upon providing 900 with at least three (3) working day's notice, Investor may inspect the books and records of 900. Investor shall do so in a fashion that does not cause the business activity of 900 to be interrupted.

14) This Agreement may be executed in counterparts. All counterparts shall be construed together and shall constitute one agreement. Further, a facsimile reproduction of a party's signature shall be binding upon such party.

IN WITNESS HEREOF, 900 Capital Services, Inc. and ████████████ have caused this Agreement to be executed.

900 Capital Services, Inc.                    Investor:


By: _____                By: _____
Title: _____                Title: _____

G:\DOC\900\FINANCE\INVAGR.DOC
H:\WP\CLIENT\900\AGRMT.DOC ( 101294)

00029

# SUBSCRIPTION AGREEMENT

Four Star Financial Services, LLC
11755 Wilshire Blvd., Ste. 2150
Los Angeles, CA 90025

Ladies and Gentlemen:

The undersigned ("Subscriber") is delivering this Subscription Agreement to Four Star Financial Services, LLC, a California limited liability company (the "Company"), in connection with the Company's offering (the "Offering") of its Class B, C, D, E, F and G membership units ("Units") and Cash Flow Notes ("Notes") pursuant to a Private Placement Memorandum dated June 30, 1997 (the "Memorandum").

1.      **General.** Subscriber understands the following:

1.1      Class B and C Units are being offered only to prospective investors who are holders of Cash Flow Notes issued by 900 Capital Services, Inc. ("Capital Services"), to Affiliates (as defined below) of such prospective investors and to other persons specially designated by the Company. Class D, E, F and G Units are being offered to those persons and to all other prospective investors. Notwithstanding the foregoing, a Special Cash Flow Note Holder (as defined below) and the Special Cash Flow Note Holder's Affiliates may not purchase Units of any Class which has a higher priority return (as set forth in the table contained in Section 1.3 below) than the annual interest rate payable upon the Cash Flow Note held by such Special Cash Flow Note Holder. A "Special Cash Flow Note Holder" means a holder of a Cash Flow Note with respect to which Note a finder's fee or other commission is regularly paid by Capital Services, as indicated on the books and records of Capital Services. If Subscriber is a Special Cash Flow Note Holder, Subscriber has received a copy of a letter delivered by Capital Services to the Company stating that Subscriber is a Special Cash Flow Note Holder and indicating the rate of interest paid on Subscriber's Cash Flow Note. "Affiliates" means (a) each person or entity which, directly or indirectly, controls, or is controlled by, or is under common control with, Subscriber, (b) each person that is related to Subscriber by blood, marriage or adoption, but no more remote than a first cousin, and (c) the trustee of any trust created by or for the benefit of Subscriber or any of the foregoing relatives.

1.2      Each Unit will entitle its holder to certain distributions payable from Available Cash from Operations (as defined in the Company's Amended and Restated Operating Agreement), including a cumulative annual priority return equal to a percentage of the capital account attributable to such Unit (such percentage is set forth opposite the applicable Class in the table contained in Section 1.3 below).

1.3      Each Unit is being offered at a purchase price of $25,000. However, each Subscriber, alone or together with his, her or its Affiliates, must subscribe for a minimum number of Units, as set forth in the following table (the second column of this table sets forth the minimum purchase requirements applicable to Cash Flow Note holders and their Affiliates, and

the third column of this table sets forth the minimum purchase requirements applicable to all other investors):

| Class | Minimum Purchase for Cash Flow Note Holders and their Affiliates * | Minimum Purchase for Other Investors* | Priority Return |
|-------|------------------------------------------------------------------|---------------------------------------|-----------------|
| B | 40 Units | ** | 18% |
| C | 20 Units | ** | 17% |
| D | 10 Units | 40 Units | 16% |
| E | 1 Unit | 20 Units | 15% |
| F | 1 Unit | 10 Units | 14% |
| G | 1 Unit | 1 Unit | 13% |

\*　But see limitations described above on the Classes that may be purchased by Special Cash Flow Note Holders.
\*\*　May not be purchased by other investors.

If the outstanding principal under a Cash Flow Note tendered for payment exceeds the purchase price for a Unit but is not in a whole multiple of such purchase price, Subscriber will be deemed to have elected to purchase a fractional Unit equal to such excess amount. Fractional Units may not otherwise be purchased, except with the written approval of management. Notwithstanding the assignment of Cash Flow Notes to the Company by Subscriber, prior to acceptance of the subscription by the Company, Subscriber will continue to be entitled to any interest paid on such Notes as well as any accrued but unpaid interest thereon as of the date of acceptance.

1.4　　Each Note is offered in multiples of $5,000. The rate of interest payable with respect to each Note is determined by the Company at the time of issuance in its discretion, taking into account the needs of the Company for funds, the availability of funds from other sources, and prevailing market conditions. Upon completion of this Subscription Agreement and tentative acceptance by the Company, Subscriber will be advised of the applicable rate of interest. Subscriber may accept such rate or decline such rate; if the latter, Subscriber's money will be returned immediately. Notes are due and payable on a fixed due date determined by the Company at the time of issuance of the applicable Note. Subscriber understands that by the terms of the Note, the Company may not be permitted to pay the Note on the fixed due date but rather defer payment until the Available Cash Flow (as defined) is sufficient to permit payment in accordance with the terms of the Note.

1.5　　This Subscription Agreement is subject to additional terms, covenants and conditions, as provided hereinafter.

2

00031

2.     **Subscription.** In accordance with the terms, covenants and conditions of this Subscription Agreement, Subscriber hereby irrevocably subscribes for and agrees to purchase Units in the numbers and Classes set forth on <u>Annex A</u> attached hereto or a Note in the amount set forth on <u>Annex A</u> attached hereto and tenders herewith the purchase price by the payment method set forth on <u>Annex A</u>.

Subscriber understands that Subscriber must tender the purchase price for the Units by either (or a combination) of the following options:

<u>Option 1</u>: Certified or cashier's check (or personal check approved by the Company)

> *Instructions: Subscriber must tender herewith a certified or cashier's check or personal check approved by the Company made payable to Four Star Financial Services, LLC.*

<u>Option 2</u>: Assignment of a Cash Flow Note issued by Capital Services.

> *Instructions: Subscriber must tender herewith the Cash Flow Note' and a duly executed Irrevocable Assignment of Note in the form of <u>Exhibit A</u> attached hereto. If Subscriber has lost or misplaced the Cash Flow Note and despite a diligent search is unable to locate it, Subscriber may (in lieu of tendering the Cash Flow Note) complete, execute and deliver to the Company an Affidavit of Loss and Indemnity Agreement in the form of <u>Exhibit B</u> attached hereto.*

3.     **Representations and Warranties.** Subscriber hereby represents and warrants to the Company as follows:

3.1     The Units or Note, as applicable, are being acquired for Subscriber's own account, for investment purposes only, and not with a view toward resale, assignment or distribution thereof. The Units or Note are not being acquired by Subscriber as a nominee or agent for the benefit of any other person or entity.

3.2     Subscriber understands that neither the Units nor the Note have been registered under the Securities Act of 1933, as amended (the "Securities Act"), nor have the Units been registered or qualified under the securities laws of any state, and no federal or state agency has made any finding or determination as to the fairness of this investment nor has made any recommendation or endorsement of the purchase of the Units or Note.

3

00032

3.3     Subscriber is an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act ("Regulation D"), *or* Subscriber has, alone or together with Subscriber's Purchaser Representative (as defined under Regulation D), such knowledge and experience in financial and business matters that Subscriber is capable of evaluating the merits and risks of an investment in the Company.

3.4     Subscriber has been furnished with and has carefully read, understands and is familiar with the Memorandum and all exhibits thereto. Subscriber has had a fully opportunity to discuss with the Company and its managers all material aspects of investment in the Units or Note, including the opportunity to ask, and to receive answers to Subscriber's full satisfaction, regarding such questions as Subscriber has deemed necessary to evaluate this opportunity to invest. None of the information received by Subscriber is in any material respect different from or in addition to the information contained in the Memorandum.

3.5     Subscriber understands that investment in the Units or Note involves significant risks, some of which are described in the Memorandum, including the following: the Company has a limited operating history; transfer of the Units or Notes is subject to significant restrictions; there is no public market for the Units or Notes; investors must bear the economic risk of investment for an indefinite period of time; the Company may in the near future have to fund the pay-off of some or all of the Notes, the Company may be deemed to have assumed all of 900 Capital Services, Inc.'s liabilities; and if the Company is profitable the Managers will be entitled to substantial compensation, which will be paid to the Managers prior to distributions being made to Members. Subscriber has carefully considered the risks of investing in the Units or Note.

3.6     If Subscriber has utilized the services of a Purchaser Representative (as defined under Regulation D) in connection with Subscriber's proposed investment in the Units or Note , such Purchaser Representative assisted Subscriber in evaluating such investment and Subscriber has been advised by such Purchaser Representative concerning the merits and risks of the investment in general and the suitability of the investment in particular, and such Purchaser Representative has disclosed to Subscriber in writing any past, present or future material relationship, actual or contemplated, between the Purchaser Representative and its affiliates on the one hand and the Managers, the Company and their affiliates on the other hand, and any compensation received or to be received as a result of such relationship.

3.7     Subscriber has received, carefully reviewed, completed and is returning herewith to the Company the Questionnaire attached hereto as <u>Annex B</u> and, if Subscriber is not an Accredited Investor, the Questionnaire attached hereto as <u>Annex C</u>. Subscriber affirms that each response contained in such Questionnaire(s) is true and correct and understands that the Company will be relying on the accuracy of those responses. Subscriber agrees to provide to the Company, upon request, such information as may be reasonably requested by the Company to evaluate the responses contained in such Questionnaire(s).

3.8     Neither Subscriber nor Subscriber's professional advisors have been

4

00033

furnished any offering literature on which they have relied other than the Memorandum.

**3.9** If Subscriber is a corporation, partnership or other entity or is acting in the capacity of a trustee, (a) Subscriber has the requisite power to enter into this Subscription Agreement and to carry out its obligations hereunder, and (b) the execution and delivery of this Subscription Agreement and the consummation of the transactions contemplated hereby have been duly authorized by Subscriber.

**3.10** Subscriber has duly executed this Subscription Agreement, and this Subscription Agreement is a valid and binding obligation of Subscriber enforceable in accordance with its terms.

**3.11** If Subscriber is assigning one or more Cash Flow Notes of Capital Services, Inc., to the Company, Subscriber is the sole owner of such Notes, and has valid, good and marketable title to such Notes free and clear of any and all claims, liens, pledges, setoffs, counterclaims, charges, restrictions, encumbrances, security interests or other rights or interests of any person whatsoever.

**4.** **Terms, Covenants and Conditions.** Subscriber acknowledges and agrees that this Subscription Agreement is subject to, and Subscriber is bound by, the following additional terms, covenants and conditions:

**4.1** Subscriber's subscription is irrevocable until accepted or rejected by the Company in its sole discretion. HOWEVER, IF SUBSCRIBER'S STATE OF RESIDENCE IS FLORIDA, SUBSCRIBER MAY ELECT TO VOID ITS SUBSCRIPTION BY DELIVERING TO THE COMPANY WRITTEN NOTICE OF SUCH ELECTION WITHIN THREE (3) DAYS FOLLOWING SUBSCRIBER'S FIRST TENDER OF CONSIDERATION TO THE COMPANY.

**4.2** Within fifteen (15) business days of the Company's receipt of Subscriber's subscription for Units, the Company will notify Subscriber whether the subscription has been rejected or accepted by the Company. If the Company does not timely notify Subscriber whether it has accepted or rejected the subscription, the subscription will automatically be considered to have been rejected. Upon rejection, the Company will return to Subscriber any funds and Cash Flow Notes it has received from Subscriber, without interest, and the Company and Subscriber will have no further obligations to each other. If the Company accepts the subscription, the Company will place the payment tendered by Subscriber directly into the Company's account.

**4.3** Within fifteen (15) business days of the Company's receipt of Subscriber's subscription for a Note the Company will notify Subscriber whether the subscription has been rejected or tentatively accepted by the Company. If the Company does not timely notify Subscriber whether it has tentatively accepted or rejected the subscription, the subscription will automatically be considered to have been rejected. Upon rejection, the Company will return to Subscriber any funds and Cash Flow Notes of Capital Services, Inc., it has received from Subscriber, without interest, and the Company and Subscriber will have no further obligations to

5

00034

each other. If the Company tentatively accepts the subscription, the Company advise Subscriber of the proposed rate of interest and term of the Note. Within five (5) business days, Subscriber shall accept or reject the proposed rate and term. If Subscriber does not timely notify the Company whether it has accepted or rejected the proposed rate and term, the subscription will automatically be considered to have been accepted, and the Company will place the payment tendered by Subscriber directly into the Company's account. If Subscriber timely rejects the Company proposed rate and term, the Company may either propose a different rate or term (in which case the two preceding sentences shall again apply to the Company's proposed terms) or return to Subscriber any funds it has received from Subscriber, without interest, and the Company and Subscriber will have no further obligations to each other.

       4.4     MANAGEMENT RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART IN ITS SOLE DISCRETION.

       4.5     Upon acceptance by the Company of Subscriber's subscription for Units, Subscriber will be automatically admitted as a "Member" of the Company and will be deemed to have agreed to be bound by the terms, covenants and conditions of the Amended and Restated Operating Agreement of the Company (the "Operating Agreement"). Without limiting the foregoing, Subscriber shall execute a signature page to such Operating Agreement.

       4.6     The representations and warranties contained herein shall survive the closing of the transactions contemplated hereby. Subscriber shall promptly notify the Company by telephone and in writing if any representation and warranty contained herein becomes untrue prior to the date that the subscription is accepted by the Company.

       4.7     Subscriber shall indemnify, defend and hold the Company and its managers, officers, members, employees, agents, legal representatives, successors and assigns harmless from and against any and all losses, judgments, fines, claims, liabilities, costs or expenses (including reasonable attorneys' fees) or other damages of any nature incurred by any of them which are caused by or arise out of the breach of any covenant or agreement made by Subscriber in this Subscription Agreement or out of any representation, warranty or statement made by Subscriber being untrue or misleading.

       4.8     If Subscriber is a corporation, partnership or other entity or is acting in the capacity of a trustee, Subscriber shall deliver herewith to the Company a true and correct copy of Subscriber's charter documents (e.g., Articles of Incorporation and Bylaws, if a corporation; partnership agreement, if a partnership; trust agreement, if a trustee) and of the resolutions of Subscriber authorizing this subscription, if such resolutions are required by law or by Subscriber's charter documents.

    5.     General Provisions.

       5.1     This Subscription Agreement and any documents referred to herein or executed contemporaneously herewith constitute the parties' entire agreement with respect to the subject matter hereof and supersede all agreements, representations, warranties, statements,

00035

promises and understandings, whether oral or written, with respect to the subject matter hereof. This Subscription Agreement may not be amended, altered or modified except by a writing signed by the parties. Subscriber agrees to execute, acknowledge and deliver any and all further documents and writings and to perform such other actions which may be or become necessary or expedient to effectuate and carry out this Subscription Agreement.

5.2     Except as expressly indicated herein to the contrary, none of the provisions of this Subscription Agreement shall be for the benefit of, or enforceable by, any third-party beneficiary. Subscriber may not assign any of its rights under this Subscription Agreement without the prior written consent of the Company. Except as provided herein to the contrary, this Subscription Agreement and the respective rights, obligations and remedies of the parties hereunder shall be binding upon and inure to the benefit of the parties, their respective successors and permitted assigns. This Subscription Agreement, the respective rights, obligations and remedies of the parties hereunder, the interpretation hereof and all disputes, controversies and claims arising out of or related to this Subscription Agreement or the relationship between the parties created hereby shall be governed by and construed in accordance with the internal laws of the State of California, without reference to its principles of conflict of laws.

5.3     The validity, legality or enforceability of the remainder of this Subscription Agreement will not be affected even if one or more of the provisions of this Subscription Agreement will be held to be invalid, illegal or unenforceable in any respect. All Annexes and Exhibits attached hereto are hereby incorporated in and made a part of this Subscription Agreement as if fully set forth herein. The headings in this Subscription Agreement are inserted for convenience, and in no way define, limit or interpret the scope of this Subscription Agreement or any particular section. This Subscription Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[balance of page intentionally blank]

00036

IN WITNESS WHEREOF, Subscriber has duly executed and delivered this Subscription Agreement as of this _____14_____ day of _September, 2001_

*If Subscriber is an individual:*

_____
Signature

_____
Name (please print)

---

**If Subscriber is an entity:**

███████████████████████████
Name of entity (please print)

By ███████████████████████████
Signature

███████████████████_____
Name (please print)

███████_____
Title (please print)

---

*If Subscribers are joint tenants, tenants-in-common or husband and wife as community property, both persons must sign:*

_____
Signature

_____
Name (please print)

_____
Signature

_____
Name (please print)

**IMPORTANT: YOU MUST FOLLOW THE SUBSCRIPTION INSTRUCTIONS THAT ACCOMPANY THE OFFERING MATERIALS.**

\* \* \* \* \* \* \* \* \* \* \*

**IF SUBSCRIBER'S STATE OF RESIDENCE IS FLORIDA, SUBSCRIBER MAY ELECT TO VOID ITS SUBSCRIPTION BY DELIVERING TO THE COMPANY WRITTEN NOTICE OF SUCH ELECTION WITHIN THREE (3) DAYS FOLLOWING SUBSCRIBER'S FIRST TENDER OF CONSIDERATION TO THE COMPANY.**

00037

## PARTICIPATION AGREEMENT

THIS AGREEMENT made and entered into effective this <u>8th day of January 2001</u>, is entered into for the purpose and under the terms set forth below. The parties to this Agreement are Four Star Financial Services, LLC, a California limited liability company, hereinafter referred to as the "Lender" and, ███████████████ hereinafter referred to as the "Participant."

1. The Lender has entered into a Loan Agreement with a company known as Internet Revenue Network, which Agreement shall be made available to Participant for review during normal business hours. Said documents shall be maintained at 11755 Wilshire Boulevard, Suite 1350, Los Angeles, CA 90025. Said Agreement shall be herein referred to as the "IRN Loan Agreement." The IRN Loan Agreement has various obligations and requirements mandated from IRN secured by all of the assets of IRN. Further backing performance of the IRN Loan Agreement are various validity guarantees of IRN principals. The terms of the arrangement are interest only until April 30, 2001, and thereafter amortized over 12 months. It is understood that the actual amortization may be shorter or longer than that set forth above

2. It is Lender's desire to participate out the IRN Loan Agreement. The loan made available to IRN, pursuant to the IRN Loan Agreement, is six hundred fifty thousand dollars ($650,000). Participant is subscribing to participate in <u>Fifty Thousand Dollars</u> ($50,000.00) of the IRN Loan Agreement.

3. In consideration for its participation, Participant shall have the benefit of the security of an undivided interest in Lender's interest in the IRN Loan Agreement and an undivided interest (shared with other Four Star and other participants of all collateral and guarantees associated therewith, which undivided interest shall be the percentage which Participant's investment represents in the total investment of Lender in the IRN Loan Agreement.

4. As a Participant, Participant shall be entitled to receive first monies allocable to the Participant's percentage until such time that on a monthly basis Participant has received the equivalent of an eighteen percent (18%) annualized yield on its money. Further, in the event of a default and a legal proceeding against IRN and the collateral associated therewith, Participant shall be entitled to the recovery associated with Participant's percentage up to the amount of its remaining outstanding investment plus an eighteen percent (18%) annualized yield on all of its invested proceeds. Prior to any distributions to any Participants, Lender shall be entitled to deduct off the top its costs and fees associated with any recovery. Accordingly, any distribution shall be in the form of net distributions after applicable fees and costs

5. Lender shall retain the right to modify and/or adjust the IRN Loan as it deems fit.

6. In the event enforcement is required against IRN, then Lender shall have the right and authority to pursue enforcement as it reasonably deems fit.

1

00038

7.    In the event that Participant deems the Lender to be in breach of its obligations to Participant, then Participant shall provide the Lender with ten (10) days written notice to secure any such breaches. In the event that said breaches are not cured within the specified ten (10) day period of time, then the Lender may forever cure the deficiency by purchasing Participant's interest at the then outstanding principal amount plus any accrued yield up to the eighteen percent (18%) per annum amount.

8.    This Agreement shall be governed pursuant to the laws of the State of California, with sole and exclusive venue in the courts of the State of California.

9.    In the event that there is a dispute between the parties, then the prevailing party shall be entitled to recover its fees and expenses associated with said dispute.

10.   The relationship of the parties is one of co-owners of an asset, i.e., the IRN interest. The parties shall not be deemed to be co-venturers or partners in any respect.

Lender
Four Star Financial Services, LLC

By: _____

Title: _____

Participant

_____

By _____

Title: _____

2

00039

| In re: JACK GARRETT, | CHAPTER 7 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:05-bk-12488-TD |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **1888 Century Park East, Suite 1500, Los Angeles, CA 90067**

A true and correct copy of the foregoing document described **NOTICE OF MOTION AND MOTION TO DISALLOW CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT THEREOF [CLAIM NO. 178]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **October _15_, 2009** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Chapter 7 Trustee - Alberta P. Stahl - trusteestahl@earthlink.net, astahl@ecf.epiqsystems.com

☐ Service information continued on attached page

**II. SERVED BY ☑ U.S. MAIL OR ☐ OVERNIGHT MAIL (indicate method for each person or entity served):**
On **October _15_, 2009** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

Chambers of The Honorable
Thomas B. Donovan
255 E. Temple St., Ste. 1352
Los Angeles, CA 90012

☑ Service information continued on attached page

**III. SERVED BY ☐ PERSONAL DELIVERY, ☐ FACSIMILE TRANSMISSION OR ☑ EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____
___ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October _15_, 2009 | ADELAIDA OLVERA | |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court of the Central District of California.

NFR/SSK/632008/POS/18076.000

00040    **F 9013-3.1**

| In re: JACK GARRETT, | CHAPTER 7 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:05-bk-12488-TD |

## ADDITIONAL SERVICE LIST

<u>Claimant</u>

Robert H. Lipp(178)
270 18th Street
Santa Monica, CA 90402

<u>Attys. for Debtor</u>
Kenneth S. Rappaport, Esq.
1300 N. Federal Hwy, #203
Boca Raton, FL   33432

<u>Debtor</u>
Jack Garrett
23143 Kens Way
Canoga Park, CA 91304-4569

United States Trustee
725 S. Figuoera St., 26TH Floor
Los Angeles, CA 90017

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court of the Central District of California.

January 2009                                                                                        00041          F 9013-3.1
HR/3422X02.0-FB/POS/18076.000